IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

STEPHANIE SCHWINGLE,

                         Plaintiff,

         v.                                           OPINION and ORDER

HARTFORD LIFE AND ACCIDENT INSURANCE                  24-cv-125-jdp
COMPANY,

                         Defendant.

---

Plaintiff Stephanie Schwingle was a spiritual and grief counselor for Agrace Hospicecare. In 2023, she submitted a claim for long-term disability benefits for symptoms caused by long COVID. Defendant Hartford Life and Accident Insurance Company—the administrator for Agrace's benefits plan—denied the claim, largely because Schwingle failed to corroborate her alleged functional impairments. Schwingle challenges that decision under the Employee Retirement Income Security Act (ERISA), contending that Hartford placed undue emphasis on objective evidence and failed to adequately explain why it did not find the evidence she submitted to be persuasive.

Both sides move for summary judgment.[1] In a case like this one in which the claims administrator has discretion to determine eligibility for benefits, the court must affirm the administrator's decision unless the plaintiff shows it was arbitrary and capricious.

Schwingle has not met that burden. Her primary argument is that Hartford erred by requiring her to come forward with objective evidence for a condition like long COVID that is

---

[1] Hartford also moves to file a response to additional proposed findings of fact that Schwingle filed with her reply brief, and it attaches its proposed response. Dkt. 52. The motion is unopposed, and the court will grant the motion.

characterized by subjective symptoms like fatigue and brain fog. But the court of appeals rejected this argument long ago: even when symptoms are subjective, functional limitations caused by those symptoms can be objectively measured, so it is not arbitrary and capricious to ask for objective evidence. In this case, the only significant objective evidence was cognitive testing that showed no impairment. When Hartford suggested additional testing, Schwingle took no action. It is true that Schwingle's doctors supported her disability claim, but they too relied only on her subjective complaints to support their opinions regarding functional limitations, so Hartford was not required to credit those opinions either.

Schwingle points to several reasons why she believes that Hartford should have found her credible: she consistently sought treatment after her diagnosis, she was visibly upset during medical appointments, and her family observed her symptoms and the effects they had on her. The frustration of Schwingle and her family is communicated clearly in their personal statements and even in Schwingle's medical records. It would have been reasonable for Hartford to credit those statements and award benefits. And if the court were acting as the factfinder, it would be inclined to find for Schwingle.

But the question is not whether this court finds Schwingle credible or whether one reasonable view of evidence would support a finding of disability. Rather, the question is whether Hartford considered the evidence before it, explained the reasons for its decision, and identified the evidence supporting its decision. Hartford did that, so the court will deny Schwingle's summary judgment motion and grant Hartford's motion.

UNDISPUTED FACTS

The following facts are undisputed. They are taken from the parties' properties findings of fact and the administrative record.[2]

In 2017, Schwingle began working for Agrace Hospicecare Inc. as a spiritual and grief counselor. Among other things, Schwingle created care plans for the bereaved, facilitated support groups, and provided counseling.

## A. Diagnosis with COVID

In October 2021, Schwingle went to the emergency room for symptoms such as vomiting, diarrhea, and congestion. She was diagnosed with COVID-19. Schwingle took off work until November 2021, when she returned to work "intermittently." Dkt. 46, ¶ 20. She continued working part-time until January 2024.

In December 2021, Schwingle reported that she was still experiencing symptoms, including chronic fatigue, chest pain, difficulty concentrating and remembering, and depressed mood. Andrew Wright, Schwingle's treating physician, diagnosed Schwingle with long-COVID syndrome. Schwingle's advanced practice nurse prescriber recommended that Schwingle work two to four hours a day, four days a week. R. 732.

Schwingle applied for short-term disability benefits with Hartford, which administered Agrace's short-term and long-term disability benefits plan. Hartford approved the claim through early 2022.[3]

---

[2] The administrative record is located at Dkt. 32 and its attachments.

[3] The parties cite records showing either January 21, 2022, or February 22, 2022, as the end date for Schwingle's short-term benefits. R. 1220 and 1535. The difference is not material.

**B. Application for long-term disability benefits**

In March 2022, Schwingle applied for long-term disability benefits. Under the plan, a participant is entitled to disability benefits if she shows she is disabled while insured and submits "Proof of Loss." R. 1615. A participant is disabled if she cannot perform one or more essential duties of her job, and her monthly earnings are "less than 80% of [her] indexed Pre-disability Earnings." R. 1623–24. The plan does not include a precise definition of "proof of loss." Instead, it lists various things that proof of loss "may include but is not limited to," including "any and all medical information, including x-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes" and "any other information [Hartford] may reasonably require." R. 1019. The plan also states that "[a]ll proof submitted must be satisfactory to" Hartford. *Id.*

Schwingle alleged in her application that she continued to experience "severe brain fog symptoms, COVID pneumonia, shortness of breath, chest pain [and] tightness, inflammation, and long COVID." R. 1219. In response to a question about whether she suffered from cognitive impairments, Schwingle listed "brain fog, memory issues, confusion, difficulty focusing [and] learning, emotional issues." *Id.* During an interview with Hartford, Schwingle stated that her symptoms were fatigue, brain fog, insomnia, and headaches. In support of her claim, Schwingle submitted her position description, medical records from October 2021 to February 2022, and a statement from Wright limiting Schwingle to six hours of standing, sitting, and walking per day, and 20 hours of work per week. R. 1201.[4]

---

[4] In May 2022, Wright submitted another statement limiting Schwingle to part-time work. R. 1096.

## C. Hartford's review and decision

Hartford retained Dr. Joseph Braun, a specialist in occupational medicine, to give an opinion on whether Schwingle had any restrictions and limitations in her ability to work. After reviewing Schwingle's medical records, Braun concluded that he could not determine Schwingle's "[m]aximum level of functional ability . . . without valid functional testing," but the evidence Schwingle submitted did not support any limitations on her ability to work after November 2021. R. 1066. Braun provided the following summary of his reasons:

> On 11/08/21, it was noted that [Schwingle] was ambulatory, capable of driving, and unrestricted in lifting or carrying. On 11/11/21, while [Schwingle's] heart rate was elevated, blood pressure was within normal limits and cardiac examination was unremarkable. While there were decreased breath sounds with mild expiratory wheezes, RR and 02sat [respiratory rate and oxygen saturation] were within normal limits. Chest x-ray on 11/11/21 showed improving bilateral opacities, most prominent within the right upper lobe. On 12/14/21, while there were decreased breath sounds with prolonged expiratory phase, breath sounds were clear with no rales, rhonchi or wheezes. Vital signs were normal and [Schwingle] was ambulatory. On 01/14/22, while there were decreased breath sounds with prolonged expiratory phase, RR and 02sat were normal. While heart rate was elevated, blood pressure was within normal limits. On 02/18/22, while there remained decreased breath sounds with prolonged expiratory phase, vital signs were normal and cardiac exam was unremarkable. Chest x-ray on 02/18/22 showed no acute process. On 03/11/22, it was noted that [Schwingle] was getting better. While [she] reported headaches, [she] also reported pain relief with medication. There were normal vital signs, pulmonary and cardiovascular exams. On 04/04/22, [Schwingle] was noted to be ambulatory and capable of driving. On 05/05/22, in a response from Dr. Wright, it was noted that [Schwingle was] capable of working.

R. 1066–67. Hartford sent the above summary to Wright, along with a cover letter asking for Wright's response. R. 1038–51. The letter stated that Wright could indicate his agreement

with Braun if he signed the letter and returned it "without additional comments." R. 1038. Wright signed and returned the letter, without adding any comments. *Id.*

In June 2022, Hartford denied Schwingle's claim, concluding that the information Schwingle provided did not show that she met the plan's definition of disability. R. 1384. The denial letter relied on the same reasons that Braun provided. *Id.* Hartford added that Wright did not dispute Braun's opinion and provided no additional documentation when asked. *Id.*

### D. Administrative appeal

In November 2023, Schwingle filed an administrative appeal.[5] In support of her appeal, Schwingle submitted the following information:

- A personal statement describing her symptoms, including brain fog and fatigue, and how they interfere with her work, daily activities, and social relationships. R. 789–92. She also discussed anxiety, depression, headaches, insomnia, and breathing problems. *Id.* She stated that medication helps with the headaches, but overall her symptoms make it impossible for her to work full time. R. 791–92.

- Statements from Schwingle's husband and two sisters-in-law describing their observations of her symptoms, including incidents when she got confused and anxious when driving and when she was unable to do basic math. R. 796–800.

- A letter and answers to a questionnaire from Wright. He wrote in the letter that he had "inadvertently" signed the letter indicating his agreement with Braun, that Schwingle's symptoms are consistent with those of long COVID, that Schwingle "has continued to have limitations that are definitely improving," and that her request for a reduced schedule of 24 hours is "based on well-documented symptoms," such as extreme fatigue, brain fog, anxiety, depression, insomnia, and headaches. In response to the question of why he disagrees with the decision denying benefits, he said that he disagreed "based on [Schwingle's] stated symptoms" and what is known about long COVID. R. 817–21.

- Answers to a questionnaire for Kay Balink, another treating physician. In response to the question why Schwingle cannot work full time, Balink wrote that

---

[5] Neither side explains why there was such a long delay between the initial decision and the administrative appeal, but Hartford does not contend that Schwingle missed any deadlines.

working more than 20 hours a week "leads to increased fatigue [and] worsening cognitive symptoms." R. 1011.

- An annotated job description with Schwingle's notes about the accommodations she is receiving and the parts of her job she cannot do. R. 793–94.

- Requests Schwingle submitted to Agrace for leave and accommodations. R. 801–15.

- Medical records from 2021 to 2023, which included the following information:

  o Schwingle received "PEMF/Laser Treatments" to combat brain fog, R. 823–83;

  o in February 2022, Schwingle reported fatigue, insomnia, and shortness of breath, R. 960;

  o a February 2022 exam showed "diminished and prolonged expiratory phrase" when breathing, R. 962;

  o in March 2022, Schwingle reported fatigue and difficulty concentrating and driving, R. 716;

  o a statement from Wright that Schwingle could work up to 20 hours a week, R. 719;

  o in June 2022, Schwingle reported fatigue and intermittent headaches, R. 950;

  o in October 2022, Schwingle reported that she cannot focus "to do budgeting or checkbook," R. 919;

  o an October 2022 statement from Wright that Schwingle meets the criteria for long-COVID syndrome and chronic fatigue syndrome, R. 922;

  o in November 2022, Balink conducted a cognitive evaluation; the results for the cognitive tests were average or high average, and Balink described the results as "normal"; Schwingle's score on the Geriatric Depression Scale was 11 out of 15, indicating "likelihood of depression," her score on the GAD-7 scale was 19 out of 21, indicating "likelihood [of] severe anxiety"; Schwingle was "very tearful" during the exam and "needed encouragement to continue," R. 897, 906–18;

  o in December 2022, Schwingle reported that "some days working only 1 to 2 hours she will feel exhausted," that she had forgotten how to write a check, and she became confused while driving on the interstate, R. 889;

- o  in May 2023, Schwingle saw neurologist Elizabeth Lake for head pain and cognitive concerns; the results of the neurological exam were normal; Lake recommended changing sleep medications, R. 992;

- o  in November 2023, Lake wrote a letter limiting Schwingle to 24 hours of work each week and no driving more than "45 minutes one way," R. 503;

- o  during a November 2023 appointment with Lake, Schwingle's score on the GAD-7 was 11 and her score on the PHQ-9 was 13, R. 505.

### E.  Hartford's review and decision on appeal

Hartford forwarded the new information to Neil Gupta (a physician specializing in internal medicine) and Courtney Spilker (a psychologist) for an independent review. Gupta prepared a report in which he summarized the medical records and answered a questionnaire. R. 432–38. In response to a question about Schwingle's functional abilities, limitations, and restrictions, Gupta wrote the following:

> There is lack of documentation of diagnostic testing, physical examination, or other clinical findings that would support restrictions and limitations.

> The documentation indicates that the claimant has history of COVID. The claimant had originally contracted COVID back in October 2021, per the records. The claimant has reported long-haul COVID syndrome. The claimant has complaints of fatigue, as well as brain fog. However, despite her complaints, there is lack of clear diagnostic findings to substantiate that these complaints are impairing her ability to function. There is lack of evidence of diagnostic abnormalities to support her complaints to the degree that would be impairing the claimant from functioning. She had neurologic workup, which was unremarkable. She had MRI brain on November 30, 2022 which showed mild volume loss involving the frontal and temporal regions bilaterally which could be considered age appropriate finding. Remaining exam was within normal limits. She also had cognitive testing which did not support her complaints to the degree that would be impairing the claimant from functioning. Given absence of diagnostic abnormalities to support her complaints to the degree that would be impairing the claimant from functioning, restrictions and limitations are not supported.

8

R. 436–37.

Spilker summarized Schwingle's medical records related to her mental limitations and also answered a questionnaire. R. 422–31. In response to a question whether Schwingle has any mental impairments that would "impact the claimant's ability to perform sustained activity on a full-time basis," Spilker wrote the following:

> No.
>
> While the medical records do indicate that the claimant has experienced symptoms consistent with anxiety and depression, the medical records do not support that symptoms resulted in psychological or behavioral impairment. It appears that claimant was engaged in 7 sessions through a possible EAP program, without any other specialty mental health care during this review period.
>
> Specific to cognitive functioning, the claimant has not undergone formal neuropsychological evaluation but did complete several cognitive screeners (11/2022, 12/2022, 6/2023), all of which have been normal. There have been no documented observations of cognitive abnormalities beyond the claimant's own self report and she has remained functionally independent for all ADLs and IADLs. Considering this, there is no support for cognitive impairment from 11/11/21 to present and ongoing.

R. 428.

Hartford provided Schwingle copies of both reports. In response, Schwingle provided updated medical records, letters from Wright and Balink, and answers to a medical questionnaire from Lake.

Wright wrote:

> I find Dr. Neil Gupta's medical exam and review of the medical facts without any significant error in objective findings.
>
> If any objection is to be raised, it is on the basis or the subjective nature of long-haul COVID symptoms. While no objective testing found any significant problems, subjectively the patient, Stephanie Schwingle, continued to complain of brain fog and

fatigue and difficulty organizing thoughts to be able to work more than 20 hours/week or drive for any distances greater than 1 hour.

I have enclosed the CDC symptom set for long-haul COVID. That being said, the majority of persons do recover from long-haul COVID within 12–18 months.

In her letter, Balink summarized Schwingle's symptoms and explained how they are consistent with long-haul COVID, citing a CDC study. In response to Schwingle's cognitive testing results, Balink wrote:

Neurocognitive changes can be subtle on testing. Ms Schwingle's testing was normal but specifically this was to rule out neurodegenerative disorder which in fact she does not have. Neurocognitive testing particularly in people with advanced postgraduate education may not reveal subjective or subtle neurocognitive changes. These changes, in Ms. Schwingle[']s case include memory and attention, nonetheless affect patient's day-to-day function and wellbeing.

R. 60. Balink also wrote that "[d]isability evaluation [of someone with long-haul COVID] is challenged by lack of a controlled population, selection and reporting bias and a lack of standardized assessment protocols." *Id.*

Lake's questionnaire answers listed Schwingle's symptoms and provided an opinion that Schwingle was limited to no more than 24 hours of week per week and 6 hours per day. R. 55.

The additional medical records were notes from office visits to a chiropractor. R. 143–47.

In response to the new information provided by Schwingle, Spilker wrote in a supplemental report that the new information did not change her opinion. She added:

While Dr. Balink's letter noting that cognitive screening may not detect subtle cognitive deficits is accurate, it is unclear why a formal neuropsychological evaluation, which can in fact detect declines/deficits despite advanced educational levels, has not been completed. In light of unremarkable cognitive screeners to date

and lack of evidence for cognitive decline otherwise, there remains insufficient evidence to support claim of cognitive impairment.

R. 33–34.

Gupta also wrote that the additional information did not change his opinion, stating:

[T]here is lack of clear diagnostic findings to substantiate that these complaints are impairing her ability to function. There is lack of evidence of diagnostic abnormalities to support her complaints to the degree that would be impairing the claimant from functioning. The additional information does not provide clear evidence of diagnostic or other clinical data that would support claimant's complaints to the degree that would be impairing the claimant from functioning.

R. 22–23. Gupta also stated that he conferred with Spilker, and she stated:

[F]rom a neuropsychology perspective, there remains no indication for cognitive impairment. There remains no neuropsychological evaluation of cognition, administered cognitive screeners have been normal, and there are no observations of cognitive abnormality documented in visit records.

R. 24.

Hartford provided the supplemental reports to Schwingle, and she did not provide any additional medical information in response. Instead, her counsel submitted a short letter summarizing the evidence supporting her claim. R. 6.

In January 2024, Agrace terminated Schwingle.

Later the same month, Hartford upheld its decision to deny long-term benefits. After summarizing the evidence, Hartford adopted the findings of Gupta and Spilker and concluded that Schwingle "does not have a disabling condition that would have prevented her from performing the essential duties of her occupation throughout and beyond the elimination period." R. 8–11.

ANALYSIS

The plan gives Hartford discretion to determine eligibility for long-term disability benefits, so Schwingle must show that Hartford's decision to deny her claim for long-term benefits was "arbitrary and capricious." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010). A decision is arbitrary and capricious if the administrator did not give the claimant a full and fair review, *see* 29 U.S.C. § 1133, that is, if the administrator did not give the claimant an opportunity to present her evidence, if the administrator did not consider significant evidence submitted by the claimant, if there is no factual support for the administrator's decision, or if the administrator did not give specific reasons for its decision. *See Estate of Gifford v. Operating Engineers 139 Health Benefit Fund*, 126 F.4th 509, 521 (7th Cir. 2025); *Artz v. Hartford Life & Accident Insurance Company*, 100 F.4th 921, 927 (7th Cir. 2024); *Majeski v. Metropolitan Life Ins. Co.*, 590 F.3d 478, 483–84 (7th Cir. 2009); *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 324 (7th Cir. 2007). The court considers only the evidence in the administrative record. *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 981–82 (7th Cir. 1999).

Schwingle contends that Hartford's decision was arbitrary and capricious for several reasons: (1) it required her to support her claim with objective evidence and did not give reasons for discrediting her subjective symptoms; (2) it did not credit the objective evidence she submitted; (3) it disregarded important evidence, including the opinions of her treating physicians; (4) it did not identify additional evidence that she needed to submit; and (5) it did not consider whether Schwingle could perform the duties of her job. Schwingle also raises an issue that Hartford has not yet decided, which is whether a bonus she received at the end of 2022 would render her ineligible for long-term disability benefits because it raised her pay

above 80 percent of her regular earnings. The court concludes that Hartford's decision was not arbitrary and capricious, so it is not necessary to decide whether the bonus affected Schwingle's eligibility.

## A. Failure to credit subjective symptoms

Schwingle points out that the plan does not require a claimant to support her claim with objective evidence. From this, Schwingle contends that Hartford could not reject her claim for lacking objective support, especially in a case involving a condition like long COVID, which cannot be verified with testing. Rather, Schwingle says, Hartford needed to identify specific reasons for discrediting her subjective symptoms, and Hartford failed to do that.

Schwingle has not shown that Hartford's decision was arbitrary and capricious because it failed to credit her subjective symptoms. As an initial matter, Schwingle's argument regarding the difficulty of diagnosing long COVID is a strawman. Hartford did not question whether Schwingle was suffering from long COVID; rather, it concluded that she had failed to show functional limitations associated with that condition. So the difficulty in diagnosing long COVID is irrelevant.

As for whether Hartford was entitled to require Schwingle to come forward with objective evidence of functional limitations, Schwingle is correct that the plan does not expressly require a claimant to submit objective evidence. But the plan does not prohibit Hartford from requiring such evidence either. Rather, the plan states that Hartford can require a claimant to submit "any and all medical information, including x-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes" and "any other information [Hartford] may reasonably require." R. 1019. The plan also states that "All proof submitted must be satisfactory to" Hartford. *Id.*

Courts must defer to the administrator's interpretation of ambiguous terms in the plan. *Tompkins v. Central Laborers' Pension Fund*, 712 F.3d 995 (7th Cir. 2013); *Becker v. Chrysler LLC Health Care Benefits Plan*, 691 F.3d 879, 890–91 (7th Cir. 2012). And this court has previously determined that "[i]t is not arbitrary and capricious for [an administrator] to conclude that 'satisfactory proof' requires some corroboration of subjective reports." *Carter v. Reliance Std. Life Ins. Co.*, No. 23-cv-673-jdp, slip. op. at 13–14 (W.D. Wis. Dec. 13, 2024). That is consistent with numerous decisions from the court of appeals holding that an administrator may require objective evidence of functional limitations, regardless of whether the plan expressly requires objective evidence.[6]

In the cases that Schwingle relies on, the administrator disregarded functional capacity evaluations that supported the claimant. *See Holmstrom,* 615 F.3d at 769–71*; Majeski*, 590 F.3d

---

[6] *See Artz v. Hartford Life & Accident Insurance Company*, 100 F.4th 921, 931 (7th Cir. 2024) (affirming to decision to deny benefits for lack of objective support); *Holmstrom*, 615 F.3d at 769–70 ("[W]e have allowed a plan administrator to require a certain degree of 'objectivity' in terms of the measurement of physical limitations as observed in a functional capacity evaluation."); *Majeski v. Metropolitan Life Ins. Co*., 590 F.3d 478, 485 (7th Cir. 2009) ("[A] plan may deny benefits because a claimant has failed properly to document pain-induced functional limitations."); *Black v. Long Term Disability Ins.,* 582 F.3d 738, 745 (7th Cir. 2009) ("Standard's psychiatrist reviewed Black's medical records and found little objective support for her claims of fatigue and cognitive difficulties. This was sufficient rational support for Standard's denial of Black's claim."); *Speciale v. Blue Cross and Blue Shield Ass'n*, 538 F.3d 615, 622 (7th Cir. 2008) ("Dr. Blonsky did not question that Speciale suffered from fibromyalgia or that she experienced constant pain; rather, he only pointed out the lack of objective evidence supporting Speciale's claim that her pain resulted in severe functional limitations rendering her disabled."); *Williams*, 509 F.3d at 322 ("Because Williams's functional limitations due to his fatigue could be objectively measured, the Plan did not act arbitrarily and capriciously in denying Williams's initial application or appeal on the basis that the record lacked accurate documentation in this regard.").

at 480—81; *Leger*, 557 F.3d at 834–35.[7] In this case, the only evidence like a functional capacity evaluation that Schwingle submitted was her cognitive testing, but Schwingle's own doctor described the results of those tests as "normal." R. 897. So even if Hartford needed a specific reason for concluding that Schwingle was not credible, the test results provided such a reason because they were inconsistent with Schwingle's statements that she was unable to do basic functions like write a check or drive.

Schwingle points to Balink's statement that "[n]eurocognitive testing particularly in people with advanced postgraduate education may not reveal subjective or subtle neurocognitive changes." R. 60. But that statement is unhelpful for two reasons. First, the question is not whether Schwingle may have undergone "subjective or subtle neurocognitive changes"; it is whether Schwingle was suffering from symptoms that prevented her from doing her job. Balink did not offer an opinion that the cognitive testing could conceal that type of decline. Second, even if Balink is correct that the cognitive testing does not show the whole picture, the mere possibility that the tests might have limited probative value is not in itself objective evidence that Schwingle was as impaired as she says she was.

Schwingle also says that she was tearful during the cognitive testing, which suggests the tests were difficult for her. But if the results of the cognitive testing were normal despite Schwingle being under stress, it does not necessarily follow that the test results overestimated her abilities. Regardless, none of Schwingle's doctors placed any significance on Schwingle's

---

[7] Schwingle also cites *Cogdell v. Reliance Standard Life Insurance Company*, 748 F. Supp. 3d 391, 403 (E.D. Va. 2024), and *Miller v. PNC Financial Services Group, Inc.*, 278 F. Supp. 3d 1333 (S.D. Fla. 2017), for the proposition that the administrator may not require the claimant to produce objective evidence unless the plan expressly requires it. The court must follow Seventh Circuit precedent, so it is unnecessary to decide whether the cited cases are on point.

demeanor during the testing, so the court has no basis for interpreting the test results differently for that reason.

The court concludes that it was not arbitrary and capricious for Hartford to require Schwingle to support her functional limitations with objective evidence.

## B. Failure to credit objective evidence

Schwingle contends that Hartford was wrong to conclude that she did not support her claim with objective evidence, and she points to several categories of evidence in the record: her scores on GAD-7 and PHQ-9 scales, her breath tests, her tearfulness at doctor appointments, and her treatment history. Dkt. 38, at 16.[8]

GAD-7 and PHQ-9 are questionnaires for measuring anxiety and depression. They are based on the patient's own answers, so it is not clear whether they qualify as objective evidence. But even if they do, Schwingle fails to explain how they demonstrate her disability. Neither Balink or any of Schwingle's other medical providers relied on those tests to justify any work restrictions, and neither Schwingle nor her doctors explained how depression or anxiety prevented her from working. As Hartford points out, Schwingle's GAD-7 score was not significantly different before and after she was diagnosed with long COVID. R. 914–15. (It does not appear that the PHQ-9 scale was administered to Schwingle before her diagnosis.)

In her reply brief, Schwingle says that she is not arguing that her anxiety and depression are disabling "in and off themselves. Instead, they have a compounding impact when paired

---

[8] Schwingle also refers generally to her "physical examinations" and the "consistent observations of her treating providers." Dkt. 38, at 16. The court will consider the opinions of Schwingle's medical providers in the next section.

with her other conditions." Dkt. 49, at 6. But Schwingle cites no evidence of the "compounding impact," and she still does not explain how Hartford should have considered her scores.

As for the breath tests, Schwingle cites notes from medical appointments that she had "decreased breath sounds and mild expiratory wheezes" in November 2021, R. 738, "mildly diminished breath sounds and a mildly prolonged expiratory phase" in December 2021, R. 734, and a "diminished and prolonged expiratory phase" in February 2022, R. 962. But Braun noted these findings and concluded they were not significant based on other findings that Schwingle's breath sounds were clear, her vital signs and cardiac exams were unremarkable, and by March 2022, her pulmonary exam was normal. R. 1066–67. None of Schwingle's medical providers challenged that view or stated that Schwingle required limitations for breathing difficulties, and Schwingle cites no other evidence that any breathing problems caused functional impairment.

As for Schwingle's demonstration of tearfulness, Schwingle cites one appointment in November 2021 and one appointment in December 2021 during which medical providers noted that Schwingle was tearful. R. 735, 737. The court of appeals has noted that crying could be interpreted as either supporting or undermining a claim. *See Holmstrom*, 615 F.3d at 771 n.12. In any event, Schwingle cites only two incidents of tearfulness, and both occurred while Schwingle was still receiving short-term benefits. So the court cannot say that it was arbitrary and capricious for Hartford not to credit that evidence as proving Schwingle's claim for long-term benefits.

This leaves Schwingle's treatment history. Schwingle says that her "extensive and rigorous treatment" is objective proof of the degree of her impairment. Dkt. 38, at 16, 25. The court of appeals has considered treatment history in some cases. For example, in *Holmstrom*,

the court stated that it was "highly relevant" that the claimant had "undergone three surgeries and continue[d] to endure . . . a heavy regimen of pain medication." 615 F.3d at. 773. Similarly, in *Diaz v. Prudential Ins. Co. of America*, the claimant's medical history included heavy medication and repeated surgical procedures. 499 F.3d 640, 646 (7th Cir. 2007).

In this case, Schwingle consistently sought treatment from late 2021 through 2023, but she points to nothing in her medical history comparable to that in *Holmstrom* and *Diaz*. In fact, Spilker observed that Schwingle received little specialty mental health care, R. 428, and neither Schwingle's medical providers nor Schwingle herself disputed that observation.

The court concludes that Hartford did not act arbitrarily and capriciously by refusing to credit Schwingle's GAD-7 and PHQ-9 scores, her pulmonary tests, her affect during appointments, or her medical history as objective evidence showing disability.

## C. Disregarding evidence

Schwingle contends that Hartford failed to explain why it did not credit the opinions of her treating physicians and other evidence in the record. Schwingle has not shown that Hartford's failure to credit this evidence was arbitrary and capricious.

### 1. Medical opinions

As for the opinions of Schwingle's doctors, it is undisputed that Hartford's medical reviewers discussed each of those opinions.[9] But Schwingle says that Hartford and its reviewers did not adequately "engage with" with her doctors' opinions by devoting specific portions of

---

[9] Hartford's decisions contained little of their own reasoning. Rather, they included summaries of the evidence and then statements that Hartford was adopting the reasoning of the medical reviewers. Schwingle does not appear to challenge that process in this case, but even if she had, the court of appeals has previously upheld decisions in which the administrator adopted the reasoning of medical reviewers rather than engage in its own analysis. *See Williams*, 509 F.3d at 324–25.

the reviewers' reports or Hartford's decision to explaining why they did not agree with each opinion. Dkt. 49, at 2.

Schwingle does not cite any authority for the view that the administrator is required to separately explain why it believes that each opinion is persuasive or unpersuasive. "ERISA does not require plan administrators to accord special deference to the opinions of treating physicians," and "courts may not impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 607 (7th Cir. 2007). It is true that "[a]dministrators may not arbitrarily refuse to credit a claimant's reliable evidence, including opinions of a treating physician." *Holmstrom*, 615 F.3d 758 at 774. But that is not what Hartford did here.

It is clear from Hartford's decision and the reports of its medical reviewers that Hartford declined to credit Schwingle's doctors for the same reason it declined to credit Schwingle's subjective symptoms: the doctors identified no objective evidence that supported their opinions. For example, after receiving additional information from Schwingle's treating physicians, Gupta wrote that the information "does not provide clear evidence of diagnostic or other clinical data that would support claimant's complaints to the degree that would be impairing the claimant from functioning." R. 22–23. Spilker similarly wrote, "In light of unremarkable cognitive screeners to date and lack of evidence for cognitive decline otherwise, there remains insufficient evidence to support claim of cognitive impairment." R. 33–34. That understanding of the treating physicians' opinions was not arbitrary and capricious.

As for Wright, he initially indicated his agreement with the medical reviewers, and Hartford relied on that agreement in making its initial decision to deny benefits. Even after

Wright stated during the administrative appeal that he had made a mistake, he identified no basis for disagreeing with medical reviewers or for imposing work restrictions on Schwingle other than Schwingle's subjective complaints.

As for Balink, she provided a letter explaining the subjective nature of a long-COVID diagnosis and symptoms, and, as already noted, she expressed her opinion that the cognitive testing she performed had limited probative value. But her discussion of long COVID was not helpful because it was about Schwingle's long–COVID diagnosis, which Hartford was not challenging. And her opinion about the cognitive testing was that it did not definitively undermine Schwingle's claim; she did not say that the testing was independent evidence supporting the claim. Rather, she pointed to no objective evidence supporting functional limitations.

Lake was no different. She provided opinions that Schwingle's ability to work was limited, but she provided no support for them.

The court of appeals has previously held that an administrator may reject a treating physician's opinion if the physician does not explain the basis for the opinion or if it is not supported by objected evidence. *Williams*, 509 F.3d at 325; *Artz*, 100 F.4th at 929–30. That is what Hartford did in this case, so its decision not to credit the treating physicians' opinions was not arbitrary and capricious.

Schwingle also contends that Hartford should have contacted her physicians if it needed more information from them, citing *Crespo v. Unum Life Ins. Co. of America*, 294 F. Supp. 2d 980, 994 (N.D. Ill. 2003). There are notes in the record that one of Hartford's medical reviewers *did* attempt to contact Wright multiple times. R. 5, 1058. Regardless, the court of appeals has declined "to impose a requirement on the Plan to consult with [the claimant's]

treating physicians," so long as the medical reviewers retained by the administrator are qualified to offer their opinions. *See Mote*, 502 F.3d 608. Schwingle does not challenge the medical reviewers' qualifications in this case.

### 2. Other evidence

Schwingle says that Hartford failed to properly weigh two other types of evidence: her activities of daily living and Hartford's previous decision to award short-term disability benefits.

As for Schwingle's activities of daily living, Spilker stated that Schwingle "has remained functionally independent for all" activities of daily living. R. 428. Schwingle contends that an ability to perform activities of daily living does not show an ability to work full time, and, even if it did, Spilker overlooked declines in Schwingle's ability to perform daily activities. Schwingle points to her statements that she now makes simpler meals than she used to, has difficulty keeping her house clean and organized, forgot how to write a check, and gets confused when driving. She also points to her husband's statement that on one occasion "she couldn't add up the cost of dinners and raffle tickets." R. 796.

Spilker did not equate Schwingle's activities of daily living with working full time, and she did not say that Schwingle has not experienced any changes with those activities. She said only that Schwingle has remained "functionally independent," something that Schwingle does not dispute.

It would not have been unreasonable for Hartford to credit Schwingle's statements and her family members' observations. But this is really just another argument that Hartford was not entitled under the plan to require Schwingle to come forward with objective evidence of functional limitations. The court has rejected that argument, so this argument fails as well.

21

As for Hartford's decision to award short-term disability benefits, it is well established that a decision to approve short-term benefits does not create a presumption in favor of a decision for long-term benefits, *Leger*, 557 F.3d at 832, but the court may consider a previous award of benefits as a factor in determining whether the administrator's decision was arbitrary and capricious, *Holmstrom*, 615 F.3d at 767. In this case, the record does not disclose either the evidence Schwingle provided to support her short-term claim or the reasons Hartford approved the claim, so the court cannot consider the earlier decision even as a factor. After Hartford made this same observation in its opposition brief, Schwingle did not respond in her reply brief, so the court deems the issue to be abandoned.

## D. Failure to specify what evidence was missing

Schwingle argues in the alternative that Hartford did not adequately explain what objective evidence it wanted her to submit. The court of appeals has previously held that administrators must substantially comply with 29 C.F.R. § 2560.503-1(g)(iii), which requires the administrator to describe "any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." *See Love v. National City Corp. Welfare Benefits Plan*, 574 F.3d 392, 396 (7th Cir. 2009).

Hartford substantially complied with this requirement. It is true that Gupta did not identify specific tests that Schwingle should undergo. Instead, he stated more generally that Schwingle failed to provide "diagnostic or other clinical data that would support claimant's complaints to the degree that would be impairing the claimant from functioning." R. 23. But Schwingle cites no authority for the view that more specificity was required. In *Love*, the court stated that the administrator's description of missing information must "allow the claimant to

22

address the determinative issues on appeal and to ensure meaningful review of the denial." 574 F.3d at 396. Gupta's explanation did that. In *Williams*, the court concluded that it was enough for the administrator to point out that "the record lacked any specific data reflecting [the claimant's] functional impairment." 509 F.3d at 323. Similarly, in *Artz*, it was enough that the administrator informed the claimant that he "had not come forward with any objective evidence to substantiate the need for additional fatigue-or focus-based restrictions or other functional limitations." 100 F.4th at 929–30.[10] Gupta was at least as specific as the reviewers in *Williams* and *Artz*.

Even if more specificity was required, Spilker provided that specificity, noting that Schwingle had not undergone a formal neuropsychological evaluation. R. 428. Spilker emphasized that point later, writing, "it is unclear why a formal neuropsychological evaluation, which can in fact detect declines/deficits despite advanced educational levels, has not been completed." R. 33–34. Neither Schwingle nor her medical providers responded to that concern, and Schwingle does not say now that she was unable to obtain such an evaluation.

The court concludes that Hartford substantially complied with § 2560.503-1(g)(iii), and it adequately explained to Schwingle what additional evidence she needed to support her claim.

---

[10] *Artz* also rejected an argument that it was the duty of the administrator rather than the claimant to seek additional testing. 100 F.4th at 930. This court previously reached the same conclusion. *See Niemuth v. EPIC Life Insurance Company,* 643 F. Supp. 3d 869, 886 (W.D. Wis. 2022).

### E.  Failure to consider Schwingle's job duties

Citing *Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 619 (6th Cir. 2006), Schwingle contends that Hartford's decision was arbitrary and capricious because Hartford failed to consider whether she could perform the specific duties of her own job. This argument fails.

Both Gupta and Spilker reviewed Schwingle's job duties, and the questionnaire that Gupta answered directed Gupta to consider various physical and mental limitations. R. 436. Schwingle does not contend that the questionnaire omitted any potential limitations that would be relevant to performing her job. In any event, the reviewers' opinions were not contingent on particular job duties. Rather, their opinions were that—regardless of Schwingle's job duties—Schwingle had not submitted any objective evidence of functional impairment. So there would be no point to discussing particular job duties in their reports, and it was not arbitrary and capricious to not list Schwingle's job duties in the medical reviewers' reports.

### ORDER

IT IS ORDERED that:

1.  Defendant Hartford Life and Accident Insurance Company's motion for leave to file a response to plaintiff Stephanie Schwingle's supplemental proposed findings of fact, Dkt. 52, is GRANTED.

2.  Schwingle's motion for summary judgment, Dkt. 37, is DENIED.

3.  Hartford's motion for summary judgment, Dkt. 34, is GRANTED.

4. The clerk of court is directed to enter judgment in Hartford's favor and close the case.

Entered April 4, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge
